IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BRENDA LEE SENEY, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 12-1706-RGA |
| | : |
| CAROLYN COLVIN, Acting | : |
| Commissioner of Social Security[1] | : |
| | : |
| Defendant. | : |

## **MEMORANDUM OPINION**

Brenda Lee Seney, Wilmington, Delaware. Pro se Plaintiff.

Charles M. Oberly III, United States Attorney, Wilmington, Delaware and Patricia A. Stewart, Special Assistant United States Attorney, Office of the General Counsel Social Security Administration. Of Counsel: Nora Koch, Esquire, Acting Regional Chief Counsel, Region III and Lauren Donner Chait, Assistant Regional Counsel of the Office of the General Counsel Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant.

Dated: November 5, 2013
Wilmington, Delaware

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security, effective February 14, 2013, to succeed Commissioner Michael Astrue, whose term expired on February 13, 2013. Pursuant to Fed. R. Civ. P. 25(d)(1) and 42 U.S.C. § 405(g), Carolyn W. Colvin is automatically substituted as the defendant in this action.

*Andrew G. Andrews*
ANDREWS, UNITED STATES DISTRICT JUDGE:

Plaintiff Brenda Lee Seney appeals the denial of her applications for disability insurance

benefits ("DIB") under Title II, and supplemental security income benefits ("SSI") under Title

XVI, of the Social Security Act (the "Act"). *See* 42 U.S.C. §§ 401-434, 1381-1383f. Jurisdiction

exists pursuant to 42 U.S.C. § 405(g).

Pending before the Court are cross-motions for summary judgment filed by Seney and

Carolyn W. Colvin, Acting Commissioner of Social Security. For the reasons set forth below,

the Court denies Seney's motion for summary judgment and grants the Commissioner's motion

for summary judgment.

## I.   Procedural History

Seney filed DIB and SSI applications on June 30, 2009, alleging an onset date of

disability of October 23, 2007, as a result of multiple sclerosis. (D.I. 11 at 45, 104-107, 246).

Seney was thirty-five years old on the alleged onset date. The claims were denied initially and

upon reconsideration. (*Id.* at 104-07). Thereafter, Seney requested a hearing which took place

before an administrative law judge on December 13, 2010. Counsel represented Seney at the

hearing, and Seney, her spouse, and a vocational expert testified. (*Id.* at 58-103.) The ALJ found

that Seney met the insured status requirements of the Act through December 31, 2012, and that

she was not under a disability at any time from October 23, 2007 through the date of the decision

on January 24, 2011. (*Id.* at 45-57.) Seney sought review by the Appeals Council, but it denied

her request for review and, therefore, the ALJ's decision became the final agency decision

subject to judicial review. (*Id.* at 9-13.) On December 13, 2012, Seney, proceeding *pro se*, filed

the current action for review of the final decision. (D.I. 1.)

## II. Medical Evidence

Seney presented to physician Lee Dresser, M.D., at Wilmington Neurology Consultants, P.A., on November 1, 2006, following a hospitalization in October 2006. (D.I. 11 at 350.) The impression was transverse myelitis, with a concern that it could possibly progress to multiple sclerosis. (*Id.*) Seney has since been followed by Neurology Consultants. Seney underwent an MRI on June 11, 2007, the findings of which were consistent with multiple sclerosis. (*Id.* at 346.) Seney was advised of the findings on June 28, 2007. (*Id.* at 346-347.) Seney was examined on July 26, 2007 and was clinically stable. (*Id.* at 344-345.) Seney presented to Sheria A. Hudson, MSN, NP-C at Neurology Consultants on October 3, 2007 and complained of hand, neck, and back pain. (*Id.* at 342-43.) Upon examination, Nurse Hudson noted full upper extremity strength, intact lower extremity strength, intact vibratory, touch and temperature sensation, accurate and stable coordination, and a stable and steady gait. (*Id.* at 342-43.) Seney was started on a regimen of Rebif injections.[2] (*Id.* at 343.) On November 28, 2007, after six weeks of Rebif injections, physical examination revealed no abnormal findings, and Seney reported that she was feeling well. (*Id.* at 340-41.) Seney denied weakness, visual changes, bowel or bladder issues, numbness, and balance/gait disturbances. (*Id.* at 340-41.)

Seney presented to Neurology Consultants on July 10, 2008, with complaints of soreness at the injection sites where she administers the Rebif. (*Id.* at 273, 338.) The assessment was MS relapsing stable on Rebif. (*Id.*)

---

[2]Rebif is used to treat relapsing forms of MS to decrease the frequency of relapses and delay the occurrence of some of the physical disability that is common in people with MS. Rebif is not approved for treatment of chronic progressive MS. *See* http://www.rebif.com.

2

Seney presented to Neurology Consultants on January 8, 2009, with complaints of intermittent neck pain. (*Id.* at 271, 336.) She indicated that she was actively looking for employment. (*Id.*) On January 21, 2009, Seney underwent an MRI of the cervical spine, thoracic spine, and brain. The MRI of the cervical spine revealed decreased cervical cord demyelination at the C6 and C4-C5 and minimal degenerative disc bulging at C5-C6 with no disc herniation, central stenosis, or exiting nerve root compression. (*Id.* at 373-74.) The MRI of the thoracic spine provided an impression that "[n]o progression or cavitation is present and there is no cord expansion, hemorrhage or edema [and n]o evidence of thoracic spine disc herniation, central stenosis or thoracic cord impingement." (*Id.* at 378-79). The brain MRI indicated "[i]nterval decrease in size of previously described focus of demyelination within the posterior body of the left corpus callosum with minimal progression of periventricular white matter changes noted, which is nonspecific[;] no current plaque edema, acute intracranial abnormality or focal posterior fossa/brainstem involvement[; and s]table left CP angle arachnoid cyst with continued mild mass effect upon the left 7th and 8th cranial nerves." (*Id.* at 377.)

Seney presented on March 26, 2009 with complaints of back, neck, and chest pain and cold chills. (*Id.* at 257-58.) Seney was seen for a neurological follow-up on April 2, 2009. (*Id.* at 264, 334, 398.) Nurse Hudson reported the results of the MRIs taken in January 2009, noting "no progression was present." (*Id.* at 264.) Seney "had no problems with discrete weakness" and continued with the Rebif injections. (*Id.*) She related being chilled into the night hours after taking her injection, but indicated "that she does not always premedicate with ibuprofen or Tylenol prior to taking her injection" as prescribed. (*Id.*) Seney was fully oriented, had fluent speech, intact upper extremity strength, and steady gait, although the tandem gait was slow. (*Id.*

3

at 265, 335.) The assessment was MS with mild elevated liver function tests on Rebif. (*Id.* at 265.)

Seney underwent an initial physical therapy evaluation on April 7, 2009, and presented with cervical pain that she rated at seven to nine out of ten with all activities of daily living. (*Id.* at 263.) At the time, she indicated that she was "anticipating future employment." (*Id.*) Seney underwent physical therapy three times per week for four weeks with positive results. (*Id.* at 275-289, 434-47.) Seney presented to her neurologist on June 24, 2009, after falling when she apparently lost strength in her legs. (*Id.* at 267, 443.) Seney indicated she had been working in the volunteer program for social services moving furniture out of an apartment complex that was being renovated. (*Id.*) Seney was stable upon clinical examination. (*Id.*) She was prescribed a cane for use as needed. (*Id.*) Nurse Hudson completed a medical certification on June 25, 2009, and stated that it was unsafe for Seney to carry heavy items up and down stairs and that she is unable to tolerate extreme temperatures. (*Id.* at 405.)

On September 14, 2009, Seney underwent a pulmonary function test, but the American Thoracic Society criteria were not met, and the results indicate that Seney gave an inconsistent effort. (*Id.* at 324-86.) Seney presented to Dr. Dresser on September 30, 2009. (*Id.* at 306, 330.) Seney complained of dysarthria, urinary hesitancy, and some involuntary spasms and leg cramps at night. (*Id.* at 330) Seney stated that she had been using a cane to walk. (*Id.*) Seney had a stable gait, normal strength in her upper extremities, and mild weakness in the left lower extremity. (*Id.*) Examination revealed normal extraocular movements, facial strength essentially normal, normal strength in the upper extremities and mild weakness in the left lower extremity, gait cautious but not overtly spastic and mildly slow but fairly stable. (*Id.*) The impression was

4

MS with some suggestion of recent exacerbation. *(Id.)* On October 8, 2009, Seney underwent an MRI of her brain that provided an impression of "[n]o pathologic intracranial enhancement." *(Id.* at 355.)

State agency physician N. Britman, M.D., prepared an assessment of Seney's physical ability to conduct work related activities on October 16, 2009. *(Id.* at 309-15.) The primary diagnosis was MS with a secondary diagnosis of asthma. *(Id.* at 309.) Dr. Britman indicated that Seney could occasionally lift and/or carry ten pounds, frequently lift and/or carry five pounds, stand and walk for two hours in an eight-hour workday, sit for six hours in an eight-hour workday, with an unlimited ability to push and/or pull. *(Id.* at 310.) Dr. Britman determined that Seney could frequently stoop and kneel; occasionally climb a ramp or stairs, balance, crouch, and crawl; and never climb a ladder, rope, or scaffold. *(Id.* at 312.) In addition, because of her asthma and because heat aggravates MS symptoms, Seney should avoid concentrated exposure to extreme hot and cold, temperatures, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation. *(Id.* at 313.) Seney had no manipulative, visual, or communicative limitations. *(Id.* at 312-13.) State agency physician Anne C. Aldridge, M.D., affirmed Dr. Britman's assessment of Seney's physical ability to perform work related activities. *(Id.* at 321.) State agency physician Lawrence A. Churchville III, M.D., also reviewed and affirmed Dr. Britman's assessment. *(Id.* at 322-23.) In addition, Dr. Churchville opined that a "cane is not required for ambulation. It is used occasionally when the claimant is having episodes of weakness or unsteadiness. Fingering or feeling is not limited in light of sensory examination described as 'unremarkable.'" *(Id.* at 322.)

5

Seney was examined by Nurse Hudson on November 17, 2009. (*Id.* at 328.) Following the examination, Nurse Hudson made an assessment of MS with some residual sensory symptoms and left lower extremity weakness. (*Id.* at 329.) On January 28, 2010, Dr. Dresser indicated that Seney had normal strength in her upper extremities, near normal strength in her lower extremities, and a stable gait, but she could only recall one word of three at three minutes. (*Id.* at 327.) Impression was MS with possibly associated cognitive problems. (*Id.*)

Dr. Dresser completed a Multiple Sclerosis Residual Functional Capacity Questionnaire on May 22, 2010. (*Id.* at 388-91.) Seney's prognosis is "fair." (*Id.* at 388.) Seney's symptoms include fatigue, balance problems, weakness, difficulty remembering, sensitivity to heat, numbness, unstable walking and difficulty solving problems. (*Id.*) Dr. Dresser indicated that Seney did not have "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait or station." (*Id.* at 388.) Dr. Dresser determined that Seney's symptoms frequently interfered with her attention and concentration, and she was incapable of even low stress jobs. (*Id.* at 389.) He opined that Seney can stand and walk for less than two hours in an eight hour workday, can sit for at least six hours in an eight hour workday, needs unscheduled breaks every two hours, can rarely lift and carry less than ten pounds, rarely climb stairs, and never twist, stoop, crouch, or climb ladders. (*Id.* at 390-91.) Dr. Dresser indicated that Seney would likely be absent from work about two days per month. (*Id.* at 391.)

An esophagram and double contrast upper GI series was performed on May 5, 2010 due to complaints of chest pain. The examination provided an impression of gastroesophageal reflux and small sliding hiatal hernia. (*Id.* at 416, 462.) A May 24, 2010 examination of Seney's

6

abdomen and pelvis due to complaints of pain provided an impression of "[m]ultiple cavernous hemangiomas of the liver noted. No acute process." (*Id.* at 415, 461.) A physical examination of Seney by Dr. Dresser on May 27, 2010, was essentially normal. (*Id.* at 326.)

Seney was referred to Louis Amine Chaptini, M.D., on June 15, 2010 for complaints of chest pain and abnormal x-rays. (*Id.* at 412, 470.) Dr. Chaptini determined that Seney had nothing more than heartburn and recommended she take a proton pump inhibitor. (*Id.* at 412, 471.) Physical examination revealed no abnormal findings with no chest pain, urinary symptoms, myalgia or arthralgia. (*Id.*) Examination by Dr. Dresser on June 30, 2010, was normal with the exception of mild weakness of the left knee flexors and foot dorsiflexor and a gait "done with a mild limp." (*Id.* at 325.)

Seney was hospitalized with vertigo in October 2010. Seney presented to Dr. Dresser on November 30, 2010. (*Id.* at 324.) Upon physical examination Seney walked well and her speech was clear. (*Id.*) The impression was MS with possibly associated cognitive problems, rule out UTI, hypocalcemia and hypokalemia of unclear etiology. (*Id.*)

On December 2, 2010, Pasquale Fucci, M.D. reported that Seney has MS and he opined that her condition was getting worse and that she would need to be out of work. (*Id.* at 408.) Dr. Dresser completed a Temporary Assistance for Needy Families Medical Prognosis form on December 16, 2010. (*Id.* at 409-10). Therein, Dr. Dresser stated that Seney had numbness in her feet and hands, she could not sit or stand up to four hours, could not climb a flight of stairs or walk one hundred yards without pause, had difficulty manipulating objects, could not participate in small group settings, and may have limiting cognitive problems; but was capable of lifting up to five pounds and walking a little bit. (*Id.* at 409-10.)

7

## III.   Administrative Hearing

### A.   Testimony of Seney and her Spouse

At the time of the hearing, Seney was 37 years old. (*Id.* at 61.) She is a high school

graduate and lives at home with her five children who range in age from nine to sixteen. (*Id.* at

62.) Seney stopped working after she was diagnosed with MS. (*Id.* at 63, 85.) She previously

worked in a warehouse, at a fast food restaurant, and as a cleaning person. (*Id.* at 66-68.) Seney

testified that in June 2009 she was in a volunteer work program through the Welfare program.

(*Id.* at 63, 85-86.) She moved furniture up and down stairs and was concerned that she could

possibly fall. (*Id.* at 85-86.) The volunteer work was four hours per day, five days per work, and

lasted a couple of months. (*Id.* at 94-96.) Seney stopped when she could no longer do the work.

(*Id.* at 96.)

Seney holds a driver's license and drives occasionally, but does not go anywhere by

herself. (*Id.* at 68.) Seney cooks and cleans once in a while. (*Id.*) At the time of the hearing,

Seney testified that she was unable to walk up and down steps or hills due to shortness of breath

and chest pains. (*Id.* at 63, 68) Her left side is numb, her fingertips are numb, her feet stay cold,

and she has fallen a few times. (*Id.* at 68.) Her legs are weak and she cannot do a lot of

climbing. (*Id.*) She is at risk for falling. (*Id.* at 84.) In addition, she has incontinence. (*Id.* at

68.)

Dr. Fucci is Seney's primary care physician and Seney sees Dr. Dresser for the MS, and

Dr. Chaptini for her liver. (*Id.* at 71-72.) Seney does not see a psychologist or psychiatrist. (*Id.*

at 72.) At the time of the hearing Seney took Rebif for multiple sclerosis, Prilosec for acid reflux

and chest pains, oxybutynin for incontinence, a calcium supplement, and Aleve. (*Id.* at 70, 74-

8

75.) She uses a pump for asthma. (*Id.* at 71.) The Rebif causes Seney to become light-headed, a little dizzy, and sometimes she feels nauseous. (*Id.* at 78.) When Seney takes Rebif she can stand for a little while, but then has to sit back down. (*Id.* at 79.) Sometimes she feels tired. (*Id.*) It also causes cramping, cold sweats, and trembling. (*Id.* at 81.) The side effects last a day or two. (*Id.* at 78, 81.)

## B.    The Vocational Expert

At the administrative hearing, the ALJ asked the vocational expert to described Seney's

prior relevant work in vocational terms. The vocational expert testified that Seney had worked as

a semi-skilled material handler at the medium exertional level (Dictionary of Occupational Titles,

DOT 222.387-050); an unskilled mail sorter at the light exertional level (DOT 209.687-026); and

an unskilled fast food worker at the light exertional level (DOT 323.687-014). (D.I. 11 at Tr.

77.) None of Seney's skills transfer from medium or light work to sedentary work.[3] (*Id.* at 97.)

The ALJ then asked the vocational expert to consider:

a hypothetical individual, this is a lady who is 37 years old, has a high school education, she's able to read, write, and use numbers, and has the past work history that you have described earlier; she has the following restrictions: she can lift and carry ten pounds – no more than ten pounds; she can stand and walk in excess of two hours a day but less than six; occasionally to ambulate she uses a cane; she can stoop and kneel just fine; she can crouch, crawl, squat, balance, and climb stairs only occasionally during a workday; I would put hazard restrictions in place; no ladders or scaffolds; no dangerous heights; no dangerous machinery; she should avoid concentrated exposure to heat, cold, and wet conditions, dust, fumes and gases; . . . she is capable of understanding, remembering, and carrying out simple instructions, would there be jobs in significant numbers that the

_____

[3]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a).

9

hypothetical individual could do in the competitive work force? . . . she can stand
and walk in excess of two hours in a given workday, she could sit six hours in a
given workday for a combined total of eight hours in a given workday.

(*Id.* at 97-98). The VE testified that such an individual could perform several jobs that existed in

the national economy such as an assembler (DOT 734.687-018); an inspector (DOT

669.687-014); and an order clerk (DOT 209.567-014). (*Id.* at 99.)

The ALJ asked a second hypothetical as follows:

[I]f I assign full credibility to every claim of fatigue from any source, medication
or a medially diagnosed impairment, and/or side effects of medication, be it
nausea, fatigue, dizziness, and/or problems with loss of grip and ability to handle,
finger, in the left hand due to cramping to the full extent complained of; history of
a couple of falls in the last couple of years; and/or [urinary] incontinence . . . to
the full extent complained of; in your [] opinion, with an assignment of full
credibility and assigning all these factors to the hypothetical individual, . . . would
you find it likely that they hypothetical individual would be able to sustain work
in the competitive work force?

(*Id.* at 99-100.) The vocational expert responded, "no." (*Id.* at 100.) The vocational expert

testified that the loss of productivity, increased absenteeism, the nausea, fatigue, dizziness, and

the incontinence all would erode productivity. (*Id.*) The vocational expert further testified that

85 to 90 percent productivity is necessary to sustain work at an unskilled level in this economy.

(*Id.* at 100-01.) In the vocational expert's opinion, the hypothetical individual could miss two

days of work per month without being terminated. (*Id.* at 101.)

## IV.    Standard of Review

The Court must uphold the Commissioner's factual decisions if they are supported by

"substantial evidence." *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *see Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1988). Substantial evidence does not mean a large or a considerable amount

of evidence. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citing *Consolidated Edison Co. v.*

10

*NLRB*, 305 U.S. 197, 229 (1938)). Rather, it has been defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Credibility determinations are the province of the ALJ. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). They should be disturbed on review only if they are not supported by substantial evidence. *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

## V. Regulatory Framework

Within the meaning of social security law, a "disability" is the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted or can be expected to last, for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3). To be found disabled, an individual must have a "severe impairment" which precludes the individual from performing previous work or any other "substantial gainful activity which exists in the national economy." *See* 20 C.F.R. § 404.1505. The claimant bears the initial burden of proving disability. *See* 20 C.F.R. §§ 404.1512(a), 416.905; *Podeworny v. Harris*, 745 F.2d 210, 217 (3d Cir. 1984). To qualify for disability insurance benefits, the claimant must establish that she was disabled prior to the date she was last insured. *See* 20 C.F.R. §§ 404.131, 416.912(a); *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).

To determine disability, the Commissioner uses a five-step sequential analysis. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the

11

burden of proof at step five. *Smith v. Commissioner of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (requiring finding of not disabled when claimant's impairments are not severe). If claimant's impairments are severe, at step three the Commissioner compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work.[4] *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listings, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any of the listings, the analysis continues to steps four and five. *See* 20 C.F.R. §§ 404.1520(d), 416.920(e).[5]

---

[4]Additionally, at steps two and three, claimant's impairments must meet the duration requirement of twelve months. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii-iii), 416.920(a)(4)(ii-iii).

[5]Prior to step four, the Commissioner must assess the claimant's RFC. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment[s]." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001) (quoting *Burnett v. Commissioner of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000)).

12

At step four, the Commissioner determines whether the claimant retains the RFC to perform her past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4 )(iv), 416.920(a)(4)(iv) (stating a claimant is not disabled if able to return to past relevant work). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428. If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating that a claimant is not disabled if the claimant can adjust to other work); *Plummer*, 186 F.3d at 428. As previously stated, at this last step the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See id.* In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with [her] medical impairments, age, education, past work experience, and [RFC.]" *Id.* This determination requires the Commissioner to consider the cumulative effect of the claimant's impairments, and a vocational expert is usually consulted.

At step one, the ALJ found that Seney met the insured status requirements of the Social Security Act through December 31, 2012, and that she had not engaged in substantial gainful activity since the alleged onset date. At step two, the ALJ found that Seney has the severe impairments of multiple sclerosis, arachnoidal cyst,[6] hiatal hernia, and hepatic hemangioma.[7] At step three, the ALJ determined that Seney did not have an impairment or combination of

---

[6]A fluid-filled cyst lined with arachnoid membrane, frequently situated in the sylvian fissure of the brain. *See The American Heritage Stedman's Medical Dictionary* 60 (2d ed. 2004).

[7]A noncancerous mass that occurs in the liver. *See* http://www.mayoclinic.com/health/liver-hemangioma/DS01125.

13

impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404,

Subpart P, Appendix 1. The ALJ determined that Seney had the residual functional capacity to

perform sedentary work, except that she can lift and carry ten pounds, stand and walk in excess

of two hours but less than six hours in an eight hour workday, sit for six hours in an eight hour

workday, and occasionally uses a cane to ambulate. Seney can stoop and kneel constantly,

crouch, crawl, squat, balance, and climb stairs occasionally, avoid hazards such as dangerous

heights, dangerous machinery, ladders, and scaffold, avoid concentrated exposure to heat, cold,

and wet conditions, dust, fumes, and gases. Seney is capable of understanding, remembering,

and carrying out simple instructions. At step four, the ALJ determined that Seney was unable to

perform her past relevant work. At step five, the ALJ concluded that considering Seney's age,

education, work experience, and residual functional capacity, there were jobs that existed in

significant numbers in the national economy that she could perform, directing a conclusion that

she was not disabled from October 23, 2007, through the date of the decision.

## VI.   Whether the ALJ's Decision is Supported by Substantial Evidence

Seney filed her complaint *pro se*. Therefore, the Court must liberally construe her

pleadings, and "apply the applicable law, irrespective of whether [she] has mentioned it by

name." *Holley v. Department of Veteran Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999); *see also*

*Leventry v. Astrue*, 2009 WL 3045675 (W.D. Pa. Sept. 22, 2009) (applying same in the context

of a social security appeal). Seney appears to seek a remand and/or an award of benefits on the

grounds that she is not satisfied with the decision that she is not disabled. (*See* D.I. 14.) In other

words, Seney appears to contend that the Commissioner's decision is not supported by the

substantial evidence of record. Conversely, the Commissioner contends that substantial evidence

14

supports the decision that Seney's allegations of disabling pain and limitations were not entirely credible. (*See* D.I. 17.)

After reviewing the decision of the ALJ in light of the relevant standard of review and the applicable legal principles, the Court concludes that the ALJ's decision is supported by substantial evidence. The ALJ properly considered the opinions contained in the record. In determining the weight to afford to the opinion of a treating source, the ALJ must weigh all evidence and resolve any material conflicts.[8] *See Richardson v. Perales*, 402 U.S. 389, 399 (1971); *Fargnoli*, 247 F.3d at 43 (recognizing that the ALJ may weigh the credibility of the evidence). The regulations generally provide that more weight is given to treating source opinions; however, this enhanced weight is not automatic. *See* 20 C.F.R. § 404.1527(d)(2). Treating source opinions are entitled to greater weight when they are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with "other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see Fargnoli*, 247 F.3d at 43. "Although a treating physician's opinion is entitled to great weight, a treating physician's statement that a plaintiff is unable to work or is disabled is not dispositive." *Perry v. Astrue*, 515 F. Supp. 2d 453, 462 (D. Del. 2007). The ALJ may discount the opinions of treating physicians if they are not supported by the medical evidence, provided that the ALJ adequately explains his or her reasons for rejecting the opinions. *See Fargnoli*, 247 F.3d at 42. When a treating

---

[8]The court notes that the ALJ's review and determination of weight for a treating physician's opinion is not unlimited. "In choosing to reject the treating physician's assessment, an ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000) (citations omitted).

15

physician's opinion conflicts with a nontreating physician's opinion, the Commissioner, with good reason, may choose which opinion to credit. *See Morales v. Apfel*, 225 F.3d at 317.

If a treating opinion is deemed not controlling, the ALJ uses six enumerated factors to determine its appropriate weight. *See* 20 C.F.R. § 404.1527(d) (1-6). The factors are: (1) whether there is an examining relationship; (2) the length of, and the nature and extent of, the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. *See id.* The supportability factor provides that "[t]he better an explanation a source provides for an opinion, the more weight [the ALJ] will give that opinion." 20 C.F.R. § 404.1527(d)(3). Similarly, the consistency factor states that the "more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 C.F.R. § 404.1527(d)(4).

At step four, the ALJ determined that Seney could no longer perform her past relevant work and proceeded to step five of the sequential evaluation. The ALJ considered Seney's statements concerning the intensity, persistence, and limiting effects of her symptoms and found them not credible to the extent that they are inconsistent with the ALJ's residual functional capacity assessment. Although allegations of pain and other subjective symptoms must be consistent with objective medical evidence, *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529), the ALJ must still explain why she is rejecting the testimony. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983) (court set aside an ALJ's finding because he failed to explain why he rejected certain non-medical testimony). Here, the ALJ provided a detailed explanation of why she rejected Seney's testimony regarding the effects of her symptoms, most notably that there is no objective medical evidence in the

16

record that suggests her impairment is of such severity as would preclude her from performing all work-related activities. The evidence in the record supports this finding, and Seney has failed to show other evidence which contradicts or undermines the ALJ's conclusion. *See* 20 C.F.R. § 404.1529(c); *Schaudeck v. Commissioner of Soc. Sec. Admin.*, 181 F.3d 429, 433 (3d Cir. 1999); SSR 96-7p (explaining that the Social Security regulations provide that allegations of pain and other subjective symptoms must be supported by objective medical evidence, and an ALJ may reject a claimant's subjective testimony if he does not find it credible as long as he explains why he is rejecting the testimony).

The ALJ considered Seney's severe impairments of multiple sclerosis, arachnoidal cyst, hiatal hernia, and hepatic hemangiomas and properly found that: (1) the medical record did not contain diagnostic tests consistent with Seney's description of the severity and intensity of the MS; (2) medication was effective in relieving symptoms from gastro-esophageal reflux; (3) the hiatal hernia was small with no abnormal findings; (4) there is no symptomatology with regard to the arachnoidal cyst; and (5) there is no evidence in the record of physical manifestations with regard to the hepatic hemangiomas. The ALJ also considered Seney's asthma, noting that it was controlled with medication, and her incontinence, noting it was not mentioned in medical records until November 2010, that Seney had not seen a urologist regarding the condition, and there is little objective evidence that reflects the severity and intensity of the condition.

Further, the ALJ considered Seney's physical impairments in conjunction with Dr. Britman's physical residual capacity assessment and the objective medical evidence. The ALJ assigned great weight to most of Dr. Britman's assessment, noting that it was consistent with

17

objective medical evidence and the record as a whole. The ALJ gave little weight to Dr. Britman's opinions regarding crouching and kneeling and provided an explanation for doing so.

The ALJ also considered Seney's physical impairments in conjunction with Dr. Dresser's physical residual capacity assessment and the objective medical evidence. The ALJ relied in part upon Dr. Dresser's opinion that Seney could sit for six hours in an eight hour day as consistent with the objective medical evidence of record. The ALJ gave little weight to the remainder of Dr. Dresser's assessment, most notably because his opinion was inconsistent with diagnostic tests that demonstrated Seney's MS had improved upon commencing treatment with medication and physical examinations that revealed no abnormalities and a normal gait. Finally, the ALJ provided adequate reasons for the assignment of little weight to the opinions of Nurse Hudson and Dr. Fucci.

The ALJ properly posed hypothetical questions that incorporated Seney's impairments and the vocational expert found that jobs existed in significant numbers in the national economy that Seney could perform. Accordingly, the ALJ concluded that Seney was not under a disability from the alleged onset date to the date of the decision.

Based upon the foregoing, the Court concludes that substantial evidence supports the ALJ's decision that Seney could perform a limited range of sedentary work, that jobs existed in significant numbers in the national economy that she could have performed, and that she was not disabled from October 23, 2007 through the date of the decision.

## VII.   CONCLUSION

For the reasons discussed above, Seney's motion for summary judgment (D.I. 14) is denied and the Commissioner's cross-motion for summary judgment (D.I. 16) is granted.

An appropriate order will be entered.

18